**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AYOMIDE OLUWADAMILARE IDOWU, | |
| Petitioner, | Case No. 26 cv 11558 |
| v. | Honorable Sunil R. Harjani |
| SAM OLSON, Chicago Field Office Director, U.S. Immigration and Customs Enforcement, et al., | |
| Respondents. | |

**MEMORANDUM OPINION AND ORDER**

On the morning of September 21, 2026, Ayomide Olywadamilare Idowu, also known as Dammy, stopped to buy breakfast on her way to work. She has lived in the United States since she was six years old, when her parents brought her to the U.S. on visas from Nigeria. Still a minor, she overstayed her visa along with her parents and siblings. After her father lost his job, Idowu's family struggled with homelessness, her mother ultimately left the family to return to Nigeria, her siblings were placed in foster care, and she resided with friends. Despite these hardships, Idowu completed high school and college, worked as a Data Scientist in Chicago, and had no criminal history. As of two years ago, she was also not undocumented. The United States Citizenship and Immigration Services (USCIS) approved her application for Special Immigrant Juvenile Status (SIJS), which provided her a pathway to permanent residency in the United States.

That morning, however, marked the end of her freedom. She was arrested by Immigration and Customs Enforcement (ICE) agents as she exited a bagel shop and detained pending deportation from the United States. Idowu has now petitioned this Court for habeas corpus relief under 28 U.S.C. § 2241, alleging the Government unlawfully detained her. [1]. For the reasons articulated below, the Court grants Idowu's petition for habeas relief and orders her released within twenty-four hours.

## I. Factual Background

The following facts are undisputed, unless otherwise noted. Petitioner Idowu is a native and citizen of Nigeria who entered the United States with her parents and siblings on December 18, 2008, when she was six years old. [1] ¶ 2. Her father had

obtained a student visa to study in the United States, and Idowu, her siblings, and her mother entered the United States as dependents on her father's visa. *Id.* The family was authorized to stay in the country until May 31, 2012, but they failed to timely depart and continued to live in the United States past the deadline. [11] at 3.

Following a traffic stop in Ohio on June 12, 2017, U.S. Customs and Border Protection (CBP) became aware of her family's presence in the country, and CBP issued them Notices to Appear (NTA) for removal proceedings, charging them as deportable under 8 U.S.C. § 1227(a)(1)(B). *Id.*; [11-1] at 3. As a part of those proceedings, an immigration judge granted Idowu, her siblings, and her father voluntary departure on March 26, 2019, giving them until May 28, 2019 to leave the United States. [11] at 3. Idowu and her family, however, failed to depart by the deadline, and the immigration judge's grant of voluntary departure converted into a final order of removal. *Id.* At the time, Idowu was still a minor, and she was unaware that the order of removal had been entered against her. [1] ¶ 7.

During their removal proceedings, Idowu's family continued with their lives in the United States. In 2018, Idowu's father lost his job, and the family lost their home. *Id.* ¶ 2. After this, they were homeless and lived in a series of cars. *Id.* From 2018 to 2019, the Kansas Department for Children and Families (KDCF) investigated allegations of abuse and neglect as to Idowu and her siblings six times. *Id.* In 2019, the family secured temporary housing through the Salvation Army, but during their stay, Idowu's mother, who had a history of depression and behavior that indicated severe mental illness, left the family and returned to Nigeria. *Id.*

After her mother left, Idowu, her father, and her siblings continued to struggle with homelessness. *Id.* ¶ 3. They eventually had to leave their temporary housing and resumed living in their car. *Id.* In December of 2020, KDCF removed Dammy's younger siblings from her father's care and placed them in foster care. *Id.* At the time, Idowu was already 18 and not eligible for formal foster care. *Id.* She stayed temporarily with friends, moving from house to house through her graduation from high school in May of 2021. *Id.* ¶ 4. She went on to graduate college from William Jewell College in Liberty, Missouri, where she was in the honors program and served as student body president. *Id.* ¶ 5.

On January 13, 2024, USCIS approved Idowu's petition for SIJS, a humanitarian immigration protection program created by Congress for young people who have suffered parental abuse, neglect, or abandonment. *Id.* ¶ 6; [1-1]. USCIS also granted Idowu deferred action related to her SIJ grant for four years, until January 13, 2028, allowing her to obtain employment in the United States. [1-1]. But on September 14, 2026, USCIS terminated Idowu's deferred action before the end of her four-year period. [11-4]. In terminating her deferred action, USCIS also revoked her unexpired deferred action-based employment authorization. *See id.* (stating that her work authorization will be revoked 15 days from the date of the deferred action termination notice). Seven days later, ICE arrested Idowu in Chicago, Illinois, when

she exited a bagel shop. *Id.* ¶ 7; [11-1] at 3. The parties dispute whether ICE arrested Idowu with a valid warrant. The administrative warrant submitted by Respondents is dated for September 21, 2026, but it does not have a time stamp. [11-5]. Idowu is currently detained in Leavenworth, Kansas. [10] at 2.

## II. Procedural Background

Idowu filed the instant habeas petition seeking release from custody on September 21, 2026, the same day as her arrest. [1]. In her petition, she asks the Court to declare that her arrest and subsequent detention violated the Immigration & Nationality Act (INA), the Fifth Amendment's Due Process Clause, and the Fourth Amendment. She also requests the Court order Respondents to release her from detention without restraints on her liberty and to restore her unlawfully terminated deferred action. *Id.*

On September 22, 2026, the Court entered an order requiring the Government to respond to Idowu's petition by September 28, 2026, and to file a report describing whether Idowu was located in the Northern District of Illinois at the time the case was filed, the status of her immigration proceedings, and her current location. [9]. The Court also ordered the Government not to remove Idowu from the United States, or to any federal judicial district other than those in Illinois, Indiana, or Wisconsin. *Id.*

In their opposition, Respondents invoke 8 U.S.C. § 1252(g), arguing that this Court lacks jurisdiction to review Idowu's petition. [11]. Respondents also assert that 1) Idowu's petition impermissibly challenges USCIS's termination of her deferred action, which the Court lacks jurisdiction to restore under Section 1252(g); 2) that Idowu's arrest was lawful; and 3) that Idowu is lawfully detained under 8 U.S.C. § 1231 because she has a final order of removal. *Id.*

In their report, Respondents confirmed that Idowu was detained at the Broadview Detention Center in Broadview, Illinois, in the Northern District at the time she filed her habeas petition; that Idowu had a final order of removal; and that on September 22, 2026, at 7:03 a.m., hours before the Court entered its order barring transfer outside the district [9], Respondent had moved Idowu to the Midwest Regional Reception Center in Leavenworth, Kansas, where she remains detained. [10]. The Court ordered briefing on the petition and held oral argument on October 20, 2026. [14].

## III. Legal Background

### A. Special Immigrant Juvenile Status

Congress created SIJS in 1990 to protect a specific category of immigrant[1] children and provide a pathway to citizenship. Immigration Act of 1990, Pub. L. No. 101-649 § 153, 104 Stat. 4978 (1990). The SIJ designation is specifically intended for children who are abused, neglected, or abandoned and for whom a state court has found it would not be in their best interest to be returned to their country of origin. *See* 8 U.S.C. § 1101(a)(27)(J).

Since its initial passage, Congress has amended the SIJS statutes multiple times. However, from the start, Congress explicitly protected SIJS beneficiaries from deportation, stating that certain grounds for deportation "shall not apply to a special immigrant [juvenile] . . . based upon circumstances that exist before the date the alien was provided such special immigrant status." Immigration Act of 1990, Pub. L. No. 101-649 § 153(b), 104 Stat. 4978, 5006 (IMMACT). Under this provision, now codified at 8 U.S.C. § 1227(c), SIJ recipients may be deported on certain grounds, such as criminal convictions or threats to national security, but certain grounds of deportation, such as overstaying a nonimmigrant visa, "shall not apply." *See id.*; 8 U.S.C. § 1227(c).

While the 1990 Act prevented the physical removal of Special Immigrant Juveniles on certain grounds, it did not provide a pathway to adjust status and obtain a green card. *See* IMMACT, 104 Stat. 4978, 5006–07. Therefore, in the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (MTINA), Congress amended the SIJS statute to address these concerns. *See* MTINA, Pub. L. No. 102-232, 105 Stat. 1733. Because adjustment of status is generally only available to a person "who was inspected and admitted or paroled into the United States," 8 U.S.C. § 1255(a), Congress provided that SIJ recipients "shall be deemed" to have been paroled into the United States at the time of their entry. MTINA, 105 Stat. 1733, 1744–45 (codified at 8 U.S.C. § 1255(h)(1)). It also exempted SIJ recipients from certain grounds of inadmissibility that might otherwise apply, such as concerns about becoming a public charge. *Id.* (codified at 8 U.S.C. § 1255(h)(2)).

Qualifying for SIJS requires applicants to meet rigorous criteria Congress set. Chief among them, the applicant must be physically "present in the United States." 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(b)(3). They must also obtain a state juvenile court order that says he or she 1) is a dependent on the court or under the custody of a state agency, 2) cannot be reunified with one or both parents because of abuse, neglect, or abandonment, and 3) that it is not in their best interest to return

[1] Where not quoting other opinions or statutory language, the court uses the term "noncitizen" as equivalent to the statutory term "alien." *See Santos-Zacaria v. Garland*, 598 U.S. 411, 413 n.1 (2023).

to their country of origin.[2] 8 U.S.C. § 1101(a)(27)(J)(i)–(ii); 8 C.F.R. § 204.11(c). USCIS grants SIJ status to those after it approves the application, and the Secretary of Homeland Security consents to the applicant receiving SIJ status. 8 U.S.C. § 1101(a)(27)(J)(iii); 8 C.F.R. § 204.11(b)(5). As a result, receiving SIJ status establishes "a successful applicant as a ward of the United States with the approval of both state and federal authorities." *Osorio-Martinez v. Att'y Gen. U.S.A.*, 893 F.3d 153, 168 (3d Cir. 2018). USCIS is required to decide a SIJS petition within 180 days of receipt. 8 C.F.R. § 204.11(g).

Under this statutory framework, Congress has conferred several benefits on SIJS recipients. Most prominently, it provides a pathway to adjust status to that of a lawful permanent resident (LPR) with the possibility of becoming citizens of the United States in the future. *See* 8 U.S.C. § 1255(a), (h)(1); Special Immigrant Status, 58 Fed. Reg. 42843, 42844 (Aug. 12, 1993). It provides access to federally funded educational programming, and it gives SIJ recipients preferential status when seeking employment-based visas. *See* 8 U.S.C. §§ 1232(d)(4)(A), 1153(b)(4). It also exempts recipients from certain grounds of inadmissibility, which matters when Special Immigrant Juveniles attempt to adjust status. For example, Section 1255(h) deems SIJ recipients as parolees into the United States, despite their method of entry, and exempts them from other grounds of inadmissibility, such as not having a valid visa at the time of application for admission (Section 1182(a)(7)(A)) or unlawful presence (Section 1182(a)(9)(B)). This means that, when a visa becomes available, barriers that might typically hinder other immigrants from applying for permanent residency will not prevent a Special Immigrant Juvenile from adjusting status.

Congress has, however, set various limits on the number of visas that may be made available, *see* 8 U.S.C. §§ 1151, 1153, resulting in a waiting list when demand for visas exceeds supply, *see* 8 C.F.R. § 245.1(g)(1). The relevant visa category for SIJS recipients is the employment-based fourth preference special immigrant category visa, known as the EB-4 visa. 8 U.S.C. § 1153(b)(4). As of March 2025, more than 150,000 individuals had received SIJS classification but could not apply for adjustment of status because of a shortage of visas. *See A.C.R. v. Noem*, 809 F. Supp. 3d 103, 110 (E.D.N.Y. 2025). Idowu has been waiting since 2024 for a visa to become

---

[2] SIJS is unique among the forms of immigration relief available in the United States because it introduces the "best interest" of the child into legal determinations, marrying local child welfare law with federal immigration requirements. This consideration comes from the United Nations' Convention of the Rights of the Child, which instructs that when considering actions concerning children, "the best interests of the child shall be a primary consideration." Convention on the Rights of the Child, art. 3, Nov. 20, 1989, 1577 U.N.T.S. 3. The Convention on the Rights of the Child also instructs that children who are "temporarily or permanently deprived of his or her family environment, or in whose best interests cannot be allowed to remain in that environment, shall be entitled to special protection and assistance provided by the State." Convention on the Rights of the Child, art. 20.

available, which will allow her to file for Adjustment of Status to lawful permanent residency, but she has not yet been able to do so.[3]

SIJS also comes with a wide array of procedural protections making it difficult for the Government to strip a recipient of SIJS. *See* 8 C.F.R. § 205.2(a)–(d). First, the Government must provide the SIJS recipient with written notice of "good and sufficient cause" for revocation and next offer the recipient the opportunity to present evidence opposing revocation. 8 U.S.C. § 1155; 8 C.F.R. § 205.2(b). A revocation determination must also be memorialized in a written decision, which the SIJS recipient may appeal. 8 C.F.R. § 205.2(c), (d). By virtue of the SIJS statute's structure, a Special Immigrant Juvenile cannot adjust status through consular processing in their country of origin. *See* 8 U.S.C. § 1101(a)(27)(J) (defining a Special Immigrant Juvenile as someone who is "present in the United States" and it is not in their "best interest to be returned" to their country of origin); 8 U.S.C. § 1153(b)(4) (describing visas available to Special Immigrant Juveniles as those defined in Section 1101(a)(27)).

These significant procedural protections "bespeak [the] substantial legal relationship between [the SIJS recipient] and the United States." *Osorio-Martinez*, 893 F.3d at 174; *see also Rodriguez v. Perry*, 747 F. Supp. 3d 911, 918 (E.D. Va. 2024). Because SIJS recipients are "a hair's breadth from being able to adjust their status," they are thus "entitled to broad constitutional protections" not customarily accorded to inadmissible noncitizens. *Osorio-Martinez,* 893 F.3d at 174 (citation omitted).

### B. Deferred Action for SIJS Recipients

In 2022, USCIS announced a deferred action program for SIJS recipients to address the visa backlog. *See* USCIS Policy Alert PA-2022-10, Special Immigrant Juvenile Classification and Deferred Action (Mar. 7, 2022) (hereinafter USCIS Deferred Action Policy).

In its policy memo, USCIS explained that "[d]ue to ongoing visa number unavailability, the protection that Congress intended to afford SIJs through adjustment of status is often delayed for years, leaving this especially vulnerable population in limbo." *Id.* at 1. USCIS also stated that approved SIJS petitioners "have a reliance interest in being provided with employment authorization consistent with

---

[3] As of October 1, 2026, Idowu is eligible to apply for LPR status. According to the October Visa Bulletin, any EB-4 applicant with a priority date earlier than January 1, 2025, can apply for a visa. U.S. DEP'T OF STATE, Visa Bulletin For October 2026, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2027/visa-bulletin-for-october-2026.html. Idowu's priority date is August 1, 2023. [1-1]. Though she can apply for LPR status, the visa is not yet eligible for approval. *Compare* Visa Bulletin For October 2026 Employment-Based Preferences, Table A "Final Action Dates for Employment-Based Preference Cases" with priority date of Dec. 15, 2022, *with* Table B "Dates for Filing of Employment-Based Visa Applications" with priority date of Jan. 1, 2025).

the congressional intent in creating the SIJ program to protect vulnerable children by providing them with a pathway to LPR status, without having to wait years before a visa is available." *Id.* at 3. Under this new program, USCIS automatically considered SIJS beneficiaries for four-year periods of deferred action and granted work authorization to those with deferred action. *See id.* at 2. Individuals "granted deferred action are considered to be in a period of stay authorized under USCIS policy for the period deferred action is in effect." USCIS Policy Manual, Vol. 1, Part H, Ch. 2(A)(4).[4] USCIS determined that SIJ recipients were "unlikely to be enforcement priorities" due to the broad waivers of inadmissibility established by Congress and ICE's own internal directives to defer enforcement actions against SIJ beneficiaries, and therefore, granting deferred action to Special Immigrant Juveniles would further conserve Department of Homeland Security (DHS) resources.[5] USCIS Deferred Action Policy at 2–3.

In June 2025, USCIS rescinded its SIJS deferred action policy. USCIS Policy Alert PA-2025-07, Special Immigrant Juvenile Classification and Deferred Action (June 6, 2025) (hereinafter USCIS 2025 Rescission Policy). A federal court stayed the rescission in November 2025, and that decision is currently on appeal. *See A.C.R.*, 809 F. Supp. 3d at 121, *appeal docketed*, No. 26-236 (2d Cir. Feb. 3, 2026). This change did not affect Idowu's deferred action. *See* USCIS 2025 Rescission Policy at 2 (stating that individuals with current deferred action "generally retain this deferred action . . . until the current validity periods expire").

## IV. DISCUSSION

### A. Jurisdiction under Section 1252(g)

Before addressing the merits of the petition, the Government contests this Court's jurisdiction to hear the matter. Idowu brings a petition for a writ of habeas corpus under 28 U.S.C. § 2241, which authorizes a district court to grant relief where the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241(c)(3). Historically, the writ has "served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *INS v. St. Cyr*, 533 U.S. 289, 301 (2001) (citations omitted). Federal courts are courts of limited jurisdiction and can resolve only those

[4] USCIS Policy Manual linked at https://www.uscis.gov/policy-manual/volume-1-part-h-chapter-2#footnotelink-26.

[5] ICE Directive 11005.3 provided that "absent exceptional circumstances, ICE will exercise discretion to defer decisions on civil immigration enforcement action against the applicant or petitioner (primary and derivative) until USCIS makes a final determination" on the pending victim-based immigration benefit petitions, including Special Immigrant Juveniles." ICE Directive 11005.3, Section 2.1 (Dec. 2, 2021). In January 2025, ICE rescinded this internal guidance. ICE Directive 11005.4.

cases that Congress grants them the power to hear. *Hain Celestial Group, Inc. v. Palmquist*, 607 U. S. 421, 424 (2026).

Respondents assert that the jurisdiction-stripping provision in Section 1252(g) divests the court of jurisdiction to adjudicate Idowu's claims. Section 1252(g) prohibits courts from hearing claims "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders[.]" Respondents argue that Idowu's detention is incidental to her lawful removal from the country, and she cannot challenge the Government's discretionary decision to briefly detain her before removal.

In support of its position, the Government points to the Seventh Circuit's decision in *E.F.L. v. Prim*, 986 F.3d 959 (7th Cir. 2021). In that case, the petitioner sought an injunction to prevent DHS from executing her removal order while she petitioned for relief under the Violence Against Women Act (VAWA). *Id.* at 962. The *E.F.L.* petitioner challenged DHS's "legal authority" to execute the removal order while her VAWA petition was pending with USCIS. *Id.* at 964–65. The district court dismissed for lack of subject matter jurisdiction, and the Seventh Circuit affirmed. On appeal, the Seventh Circuit pointed out that the petitioner's distinction between DHS's "discretionary decisions" and its "legal authority" to execute removal was illusory. *Id.* at 965. The Court determined that challenging DHS's legal authority to execute a removal order fell within Section 1252(g)'s prohibitions. *Id.*

Idowu disagrees with the Government's characterization of her claim. She states that she is not challenging the execution of her removal order but rather the legality of her detention in the context of her approved SIJ status, the lawfulness of USCIS terminating her deferred action as a pretext for her detention, and the lawfulness of her arrest. She asserts that, unlike the petitioner in *E.F.L.*, the Government has already granted her a form of protection in designating her as a Special Immigrant Juvenile, and her arrest and detention contravene those protections.

Despite the potential sweep of the statute's language, Section 1252(g) is not a "zipper" clause that precludes judicial review of all habeas petitions involving removal. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (hereinafter "*AADC*"). By contrast, Section 1252(g)'s scope is narrow and applies only to the three specific decisions or actions listed. *Id.* ("It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings."); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 19 (2020) (jurisdictional limits under 1252(g) are narrow). The Supreme Court reaffirmed *AADC*'s narrow reading of Section 1252(g) in *Jennings v. Rodriguez*, 583 U.S. 281 (2018), stating that the phrase "arising from" in the statute did not "sweep any claim that can technically be said to 'arise from' the three listed actions of the Attorney General. Instead, we read the language to refer to just those three specific actions themselves." *Id.* at 294.

In asserting that Idowu's detention lies within the bounds of Section 1252(g)'s jurisdictional bar, Respondents read the statute too broadly. Indeed, their position would inevitably render the *AADC* decision meaningless, since almost every noncitizen who brings a claim to federal court—whether through a habeas petition or some other route—does so because she is threatened with removal from the United States. *Fornalik v. Perryman*, 223 F.3d 523, 531 (7th Cir. 2000). Respondents' view would have also prevented the Supreme Court from deciding the seminal post-removal order detention case, *Zadvydas v. Davis*, 533 U.S. 678 (2001). While Idowu likely filed the instant case because she does not want to be deported to Nigeria, that alone does not sufficiently invoke Section 1252(g). *See Fornalik*, 223 F.3d at 531. This case is also nothing like *E.F.L.*, where petitioner explicitly requested the district court enjoin the removal order to prevent her deportation from the United States.

Rather than examining whether Idowu's claims are connected to her removal, the Court reviews her petition to determine whether it rests on one of 1252(g)'s listed factors. *See id.* It does not. Idowu makes clear that she challenges the legality of her detention in light of her SIJ status, USCIS's termination of her deferred action, and the lawfulness of her arrest, none of which challenges the execution of her removal order. She also does not dispute the Government's "legal authority" to execute her removal order. *See E.F.L.*, 986 F.3d at 965. Instead, she seeks to vindicate the protections afforded to her under her Special Immigrant Juvenile Status and deferred action.

Courts have the power to review immigration-related detentions following a removal order to determine whether they are constitutional. *Zadvydas*, 533 U.S. at 688. This includes a noncitizen's right to rely on habeas petitions to challenge their detention as lacking in statutory authority. *Id.* The Court finds that habeas remains available as a forum for statutory and constitutional challenges to post-removal period detention, *see id.*, and accordingly, this Court has jurisdiction to hear Idowu's claims.

### B. Unlawful Detention

Turning to the merits of Idowu's claims, her primary assertion is that, by detaining her, the Government violated her substantive and procedural due process rights under the Fifth Amendment. The Government disagrees, arguing that it lawfully detained Idowu under 8 U.S.C. § 1231 and the post-removal detention framework the Supreme Court outlined in *Zadvydas*.

#### 1. Substantive Due Process

The Fifth Amendment's Due Process Clause applies to all "persons" within the United States, including noncitizens, "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693 (internal citations

omitted). The protections afforded to Special Immigrant Juveniles include an array of statutory and regulatory rights and safeguards, such as eligibility to apply to adjust status to that of a lawful permanent resident, exemptions from various grounds of inadmissibility and deportability, and robust procedural protections to ensure the noncitizen's status is not revoked without good cause. *Osorio-Martinez*, 893 F.3d at 158. As further discussed below, the text of Section 1227(c), combined with the context, structure, and overall statutory scheme, demonstrates that the Government violated Idowu's substantive due process rights when it detained her on September 21, 2026.

**a. Section 1227(c) – Waiver of Grounds of Deportation**

Idowu's removal order is based on INA § 237(a)(1)(B), also codified as 8 U.S.C. § 1227(a)(1)(B). [11] at 3; *see also* [11-1] at 5. That section provides that anyone "who is present in the United States in violation of this chapter or any other law of the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant has been revoked) . . . is deportable." 8 U.S.C. § 1227(a)(1)(B). Overstaying a student visa, as Idowu and her family did, falls within this ground of deportability. However, in that same statutory provision is another section entitled "Waiver of grounds for deportation," which states that Paragraph (a)(1)(B) "shall not apply" to a SIJ recipient "based upon circumstances that existed before the date the alien was provided such special immigrant status." 8 U.S.C. § 1227(c). This deportation waiver explicitly bars Section 1227(a)(1)(B) as the grounds for Idowu's deportation, which implicates the Government's ability to detain Idowu on those grounds.

The Government does not dispute that Section 1227(c)'s waiver applies to Idowu. Instead, it asserts that Idowu suffers from a procedural issue. The Government claims that, unless and until Idowu follows the proper procedures to reopen her immigration case and rescind the order of removal so Section 1227(c)'s waiver can apply, her removal order remains valid. In other words, the Government does not care that Congress, through Section 1227(c), has waived the grounds for her deportation. It claims those grounds have not yet been applied to her, and only an immigration judge can do so. In fact, as stated by the Government at oral argument, an immigrant could receive SIJS one day, and then the very next day, be deported based on a prior order of removal, despite the waiver.

The Government's argument contravenes the plain text of Section 1227(c). Courts "must give effect to the clear meaning of statutes as written," *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017), under the assumption that "the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009). This Court must "begin and end [its] inquiry with the text, giving each word its ordinary, contemporary, common meaning." *Star Athletica, L.L.C.*, 580 U.S. at 414 (cleaned up).

Congress stated in clear terms that the basis of Idowu's removal, Section 1227(a)(1)(B), "shall not apply" to her based on circumstances that existed before her designation as a Special Immigrant Juvenile. The order of removal was a circumstance that existed prior to her SIJS status. The Government also does not dispute that the waiver applies to Idowu. The statute does not place any temporal or procedural requirements on that waiver. For example, it does not state that an immigration judge must effectuate the waiver. Instead, the language is explicit and maps onto Idowu's situation, with mandatory phrases like "shall not apply."

A court may deviate from a statute's text only when the plain meaning of the statute "would frustrate the overall purpose of the statutory scheme, lead to absurd results, or contravene clearly expressed legislative intent." *Jefferson v. United States*, 546 F.3d 477, 483 (7th Cir. 2008). The opposite is true here. In fact, Respondent's position leads to absurd results that contravene a clearly expressed congressional scheme. Respondent's position actively circumvents 1) the findings of the state court in determining that Idowu should be a ward of the Government; 2) USCIS's findings that she met the strict congressional criteria of SIJS; 3) the Secretary of Homeland Security's agreement with USCIS's findings; and 4) the explicit language of Congress in 1227(c). Respondents cannot so easily disregard the statute's plain meaning and its congressional scheme.

The Government asserts that her deferred status allowed Idowu to remain in the United States and that, upon cancellation of her status, her deportation was authorized. Why, then, the Government asks, is deferred status necessary if Section 1227(c) applies? Quite simply, deferred status protects SIJS recipients who do not qualify for Section 1227 waivers, such as those with criminal or security-related grounds for deportation. *See* 8 U.S.C. § 1227(c) (exempting only certain grounds of deportability and inadmissibility). For those individuals, deferred action provided broader protection than what Congress provided in Section 1227(c). The Executive Branch may exercise discretion in the immigration arena to provide additional benefits to all SIJS recipients, but it cannot diminish Congress's stated intent as reflected in the plain text of the waiver it granted to certain categories of SIJS beneficiaries.

Respondents also assert that, in order for Section 1227(c)'s waiver to apply, Idowu must file a motion to reopen before the immigration judge to rescind her prior removal order. Both parties agree that the most efficient pathway is through a joint motion to reopen with the consent of DHS, given that the technical period to reopen the hearing has expired.[6] However, although Idowu requested that DHS join her

---

[6] After a final order is entered, immigrants have 90 days to file motions to reopen. 8 U.S.C. § 1229(a)(c)(7). A motion to reopen must state the new facts that will be proven at a hearing, if the motion is granted, and if the motion is based on an application for relief, such as an adjustment of status application, the application for relief and all supporting documents must be included with the motion to reopen. 8 C.F.R. § 1003.23(b). However, the 90-day limit does

motion in April 2024, DHS waited more than two and a half years to respond and declined to join the motion only on October 5, 2026.*See* [12] at 2 n.1. Thus, Idowu did not display any lack of diligence in attempting to terminate this order of removal. The Government also conceded at oral argument that, because Idowu has SIJ status, it could not sustain the grounds of removability before an immigration judge, if the matter was reopened. This further demonstrates that the grounds for her detention and subsequent deportation are specious. Regardless of the procedural gloss that the Government applies to the waiver, the mandate of Section 1227(c) remains, and the waiver creates a liberty interest under the Due Process Clause, calling into serious question the reasonableness of Idowu's detention.

**b. Context, Structure, and Statutory Scheme**

Section 1227(c) is one part of a broader framework that Congress designed to protect children who were abused, neglected, and abandoned and provide them a pathway to lawful permanent resident status. A Special Immigrant Juvenile is, by definition, an immigrant for whom a state juvenile court has determined that reunification with one or both parents is not viable, and for whom it would not be in their best interest to be returned to their country of origin. 8 U.S.C. § 1101(a)(27)(J).

With the SIJS designation come numerous protections embedded in the statute, all of which demonstrate Congress's clear intent that SIJ beneficiaries remain in the United States pending their application for adjustment of status. This is reflected in the statute's goal of providing relief for vulnerable minors, the waivers of removability, the grant of parole and the removal of barriers to adjustment of status under Section 1255(h), and SIJ recipients' exemption from certain grounds of inadmissibility and deportability under Section 1227(c). Taken together, these statutory provisions reflect a judgment that a child who obtains SIJ status should be permitted to remain in the United States to realize what the statute envisions: a pathway to lawful permanent residence.

Indeed, USCIS endorsed the state court's findings by approving and consenting to Idowu's application, in which Idowu essentially became a "ward of the United States." *See Osorio-Martinez*, 893 F.3d at 168. Given this endorsement, and the Secretary of Homeland Security's consent, it is remarkable that the very department attempting to remove Idowu is the same one that previously acknowledged that it would not be in her best interest to return to Nigeria. Idowu's removal rests on a deportability ground that the statute explicitly addresses for SIJ recipients,

---

not apply to jointly filed motions to reopen. 8 C.F.R. § 1003.23(b)(4)(iv). Because DHS has declined to join Idowu's motion, she must file a unilateral motion to reopen and rely on the immigration court's *sua sponte* authority, 8 C.F.R. § 1003.23(b), which the Board of Immigration Appeals has recently curbed. *See Matter of Herrera-Nunez*, 29 I&N Dec. 691 (BIA 2026).

highlighting the inconsistency between congressional intent and the Executive Branch's action here.

Moreover, removing Idowu before she can adjust her status would strip her of the protections Congress sought to bestow. *See* 8 U.S.C. § 1101(a)(27)(J) (providing that SIJ status is only available to immigrants who are "present" in the United States); *Sarmiento v. Perry*, 824 F. Supp. 3d 514, 527–28 (E.D. Va. 2026) (pursuing removal of SIJS beneficiary would "inherently jettison" SIJ status for lack of presence in the United States) (quoting *Joshua M. v. Barr*, 439 F. Supp. 3d 632, 676 (E.D. Va. 2020)). Deporting Idowu while she had valid, unrevoked SIJS would "render SIJ status a nullity." *See Osorio-Martinez*, 893 F.3d at 172. At oral argument, the Government admitted that Idowu, as a SIJ beneficiary, can do essentially nothing with SIJS status if she is deported to Nigeria.

The congressional scheme to revoke SIJS also warrants examination. Congress has specifically prescribed how an approved SIJ petition may be revoked. Only USCIS can revoke SIJS after certain statutory steps, including making a showing of "good and sufficient cause," and the regulations require notice of the intent to revoke and an opportunity to respond. 8 U.S.C. § 1155; 8 C.F.R. § 205.2(a). Respondents have not followed these steps, nor have they provided any notice that they intend to revoke Idowu's SIJS.

The Court finds that the statute's context, structure, and statutory scheme, designed to protect SIJS recipients, demonstrates that they have a liberty interest in being free from detention while their residency applications are adjudicated. On this interpretation of the SIJS statutory scheme, the Court is not alone in reaching this conclusion. *See, e.g.*, *Joshua M.*, 439 F. Supp. 3d at 682 (finding that SIJS confers "significant benefits for young immigrants and certain protections against removal"); *Garcia Lanza v. Noem*, 822 F. Supp. 3d 326 (E.D.N.Y. 2026) (finding that SIJS beneficiaries have the right to live and work in the United States pending further processes); *Xol-Maas v. Francis*, 2026 WL 457005, at *8 (S.D.N.Y. Feb. 18, 2026) ("Congress clearly contemplated that SIJ designees would remain in the United States while awaiting adjudication of their adjustment of status applications."); *Sarmiento*, 824 F. Supp. 3d at 528 (finding SIJS conferred upon petitioner "the status of a parolee with inadmissibility waived as a ground for his detention or removal within the context of his challenges to his detention"); *Walter A. v. Easterwood*, 2026 WL 836428 (D. Minn. Mar. 26, 2026) (finding that SIJS recipients should remain in the United States due to congressional scheme). The SIJS statutory framework confers a host of rights that sustain a juvenile's relationship to the United States and ensure those rights are not stripped without protections. *Osorio-Martinez*, 893 F.3d at 170. Taken together, the SIJ statutory framework and the 1227(c) waiver confers a liberty interest, and Idowu's detention threatens those constitutional protections.

### c. *Zadvydas v. Davis*

The Government is currently detaining Idowu under 8 U.S.C. § 1231(a)(6), which governs the detention of noncitizens with final removal orders. In the Supreme Court's leading case on post-removal order detention, *Zadvydas v. Davis*, the Court determined that to avoid running afoul of the Due Process Clause, detention under Section 1231(a)(6) should be limited to "a period reasonably necessary to bring about" a noncitizen's removal. 533 U.S. at 689. While detention is presumptively reasonable for up to six months, reasonableness is measured "primarily in terms of the statute's basic purpose"—that is, ensuring a noncitizen's removal. *Id.* at 699, 701. If removal, however, is not reasonably foreseeable, continued detention is unreasonable and Section 1231(a)(6) no longer authorizes it. *See id.* at 699–00; *see also Munoz-Saucedo v. Pittman*,789 F. Supp. 3d 387, 400 (D.N.J. 2025).

Idowu's unrevoked SIJS status creates a constitutional barrier that makes her removal unlikely in the foreseeable future. Her due process rights attach to her SIJ status, regardless of the elimination of her deferred status. Moreover, as a SIJ recipient, her removal is based on Section 1227(a)(1)(B)'s grounds for deportation, but as discussed above, Congress has eliminated that ground by virtue of her SIJS waiver. *See* 8 U.S.C. § 1227(c). Indeed, Congress's overall goal in passing and amending the SIJS statute over the course of thirty-six years would be thwarted if Respondents were permitted to remove Idowu on a ground that it explicitly waived. Having met the SIJS statutory requirements, USCIS and DHS together affirmed that Idowu merited the benefits and rights that flow from SIJ status. Those same agencies cannot detain her on a ground that no longer applies. *See Medina Lopez v. Raycraft*, 2026 WL 1370583, at *8, *8 n.6 (E.D. Mich. May 15, 2026) (finding that petitioner could not be deported on a ground of inadmissibility waived by Section 1227(c)).

Idowu's continued detention in this context violates substantive due process. Here, the Government's goal (deportation) is no longer "practically attainable," so detention no longer bears a relation to the purpose for which Idowu was detained in the first place. *See Zadvydas*, 533 U.S. at 690 (citing *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)). Holding her in detention while she continues to have SIJS does not serve any legitimate, non-punitive purpose, and Respondents cannot justify this restriction on her liberty. Substantive due process requires her release.

### 2. Procedural Due Process

Idowu also contends that Respondents have detained her without due process required by the Fifth Amendment. Respondents counter that her detention is properly authorized under 8 U.S.C. § 1231, that her detention is presumptively reasonable under *Zadvydas*, and that, under *Parra v. Perryman*, 172 F.3d 954 (7th Cir. 1999), she is not entitled to remain free while the Government seeks to deport her. For the reasons stated below, the Court finds that Idowu's detention also violates procedural due process.

### a. Mandatory Detention

Section 1231 addresses the post-removal framework for noncitizens. That statute provides for a "removal period" of 90 days following the latest of 1) the date the removal order becomes administratively final; 2) a final order from a reviewing court that had previously entered a stay of removal; or 3) a noncitizen's release from detention or confinement. 8 U.S.C. § 1231(a)(1)(B). During the removal period, detention is mandatory. *Id.* § 1231(a)(2)(A) ("During the removal period, the Attorney General shall detain the alien.") (emphasis added). The 90-day period can only reset if one of the three categories recurs. *Id.* § 1231(a)(2)(B).

Here, Idowu was not detained when her order of removal became final on March 26, 2019. Thus, the removal period's mandatory detention requirement has long passed. Respondents do not argue otherwise. *See* [11] at 9–11 (arguing that Idowu is properly detained under *Zadvydas*, which analyzes permissive detention following the 90-day mandatory requirement). Indeed, the mandatory detention period has not applied to Idowu for more than 6 years and cannot form the basis for her current detention.

Nothing in the statute provides that a later arrest begins a new removal period. Rather, the statute explicitly lists the events that start the removal period's clock, and an arrest or detention by ICE is not one of them. Accordingly, Section 1231(a)(2)'s mandatory detention requirement does not govern Idowu's custody.

### b. Permissive Detention

Section 1231(a)(6) permits detention beyond the 90-day removal period if the noncitizen falls into one of three categories: 1) they are inadmissible under 8 U.S.C. § 1182; 2) they are removable under 8 U.S.C. § 1227(a)(1)(C), (a)(2), or (a)(4); or 3) the Secretary of Homeland Security[7] determines they are a risk to the community or unlikely to comply with the removal order. 8 U.S.C. § 1231(a)(6). Detention under Section 1231(a)(6) is not mandatory. *See id.* (stating the noncitizen "may be detained"). If a noncitizen is released after the removal period, they "shall" be subject to terms of supervision. *Id.* § 1231(a)(3), (a)(6).

Respondents assert that detaining Idowu to effectuate her removal is permissible under the Due Process Clause because *Zadvydas* makes post-removal detention "presumptively reasonable" for six months. *See Zadvydas*, 533 U.S. at 701; [11] at 10. Because Idowu has been detained for little more than a month, her detention arguably does not cross into unconstitutional prolongation. Respondents

[7] The Homeland Security Act transferred this function from the Attorney General to the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *see also* 8 U.S.C. § 1103(a)(1) (charging the Secretary of Homeland Security with administering and enforcing the nation's immigration laws).

further contend that, under the Seventh Circuit's reasoning in *Parra v. Perryman*, 172 F.3d 954 (7th Cir. 1999), Idowu has no liberty interest in remaining "at large" within the United States while the Government seeks to remove her, and thus is owed no process because her detention is not unconstitutional. *See* [11] at 11.

Respondents are wrong. After the 90-day removal period, the three categories of Section 1231(a)(6) are the only source of authority to continue to detain her. Idowu falls outside the first two categories. First, she was lawfully admitted with her family on her father's student visa, and therefore she is not inadmissible.[8] Second, Idowu's warrant of removal only lists Section 1227(a)(1)(B) as the basis of her deportation, not Section 1227(a)(1)(C) (violation of status and conditions of entry), (a)(2) (criminal offenses), or (a)(4) (security-related grounds). Respondent's authority to detain her therefore depends entirely on the third category: a determination by the Attorney General that she is a danger to the community or that she is unlikely to comply.

The statutory language makes this determination a pre-condition to her detention—she *may* be detained once the Secretary of Homeland Security *has determined* she is a danger or unlikely to comply. *See* 8 U.S.C. § 1231(a)(6) (emphasis added). However, the record before the Court reflects no such determination. *See* [11-1] at 4 (DHS Form I-213 stating that "Idowu will remain in ICE custody until a determination is made" in her case, reflecting no further findings). The regulations implementing Section 1231(a)(6) are detailed and extensive, but, at the very least, the decision to continue detention beyond the removal period requires notice in writing that must "briefly set forth the reasons for the continued detention." 8 C.F.R. § 241.4. The record shows no indication that anyone reviewed Idowu's case before or during her detention. Idowu is constitutionally entitled to this process.

In light of this statutory language, Respondents cannot rely on the 6-month presumption of reasonableness in *Zadvydas* without *any* process whatsoever. Indeed, *Zadvydas* does not permit Respondents to hold a noncitizen for six months without process no matter how long ago the removal period ended. Rather, the 6-month presumption limits how long detention may last.[9] The absence of any process forms the procedural defect at the heart of Idowu's claims.

---

[8] Respondents make no argument that she is inadmissible. However, even if she were inadmissible, for example, due to any accrued unlawful presence under Section 1182(9)(B) (which would apply at the time Idowu adjusts status under Section 1255(a) when a visa became available), a different portion of the SIJS statutory framework explicitly waives that ground of inadmissibility. *See* 8 U.S.C. § 1255(h) (stating that Section 1182(9)(B)'s inadmissibility grounds "shall not apply" when adjusting status).

[9] In fact, the petitioners in *Zadvydas* had some form of process prior to their extended detention under Section 1231(a)(6). *See Zadvydas*, 533 U.S. at 685–86 (Immigration & Naturalization Service (INS, predecessor to DHS) detained other *Zadvydas* petitioner, Kim Ho Ma, because INS was "unable to conclude that Mr. Ma would remain nonviolent and not

### c. Factors under *Mathews v. Eldridge*

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Zadvydas*, 533 U.S. at 690. That interest extends to noncitizens subject to final orders of removal. *See id.* The fundamental requirement of procedural due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation omitted). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 481 (1972)) (cleaned up). To determine what process is due, courts weigh three factors: the private interest affected; the risk of an erroneous deprivation through the procedures used, and the probable value of additional safeguards; and the Government's interest, including the burdens any additional procedures would entail. *Id.* at 335.

The first *Mathews* factor weighs heavily in Idowu's favor. Her liberty interest is substantial, *see Hernandez v. Sheahan*, 455 F.3d 772, 777 (7th Cir. 2006) (stating liberty interest is "weighty"), and for more than 7 years following her order of removal, she has lived free from the Government's restraint. *See* [1] ¶¶ 4–5 (detailing her living with her legal guardians, finishing high school, and graduating college). During that time, she met the congressional criteria to receive SIJS, received deferred action, and was working in Chicago, *id.* ¶ 6, all with the expectation that she would have the opportunity to adjust status under the protections that SIJS provided. Her liberty interest is particularly strong in a situation, such as this one, where no process was provided prior to her detention.

The second *Mathews* factor, erroneous deprivation, also counsels in Idowu's favor. She has been detained for over a month without any process, let alone constitutionally sufficient process. Indeed, Respondents' failure to provide any process before detaining her makes the value of additional procedures particularly high. *See Mathews*, 424 U.S. at 343.

As to the third *Mathews* factor, the Government has a legitimate interest in effectuating removal orders, ensuring that noncitizens appear for removal, and protecting the community. *Zadvydas*, 533 U.S. at 690–91. However, Respondents have not argued how these interests required detaining Idowu without the statutorily required steps in Section 1231(a)(6). Indeed, Idowu has lived at an address known to Respondents for several years, and USCIS granted her deferred action with knowledge of her prior removal order. *See* [11-3]. Respondents have not pointed to

---

violate the conditions of release); *Zadvydas v. Underdown*, 185 F.3d 279, 283 (5th Cir. 1999) (immigration judge ordered Zadvydas be detained pending his deportation based on his history of flight from authorities); *see also Zadvydas*, 533 U.S. at 683 (explaining that INS's regulations provided for a review to determine whether further detention or release under supervision was required after the 90-day removal period expired).

any significant fiscal or administrative burdens from providing Idowu with this modest amount of process.

Respondents rely on the Seventh Circuit's decision in *Parra v. Perryman*, alleging that Idowu has no liberty interest in remaining at large pending her removal and that the Government's interests conversely are high. In *Parra*, an immigrant was detained without bail under Section 1226(c) due to an aggravated felony conviction. 172 F.3d 954, 955–56 (7th Cir. 1999). He conceded removability, an immigration judge found him ineligible for any form of relief, and he did not argue that he was entitled to remain in the United States. *Id.* at 956. Instead, he contended that he should not have to wait in detention until his removal order became final. *Id.* Applying the *Mathews* factors, the Seventh Circuit found that, as a convicted noncitizen, Parra had no liberty interest to continue to remain in the United States, that the risk of error was "zero" given he had conceded all elements required for his removal, and the public interest was particularly high given his potential flight risk. *Id.* at 958. Parra had no legal right to remain in the United States, but the United States had a powerful interest in keeping him detained to ensure his removal. *Id.*

The circumstances in *Parra* do not apply to Idowu's case for several reasons. First, she has no criminal history, faces no criminal charges, and is not subject to the mandatory detention requirement that applied to the *Parra* petitioner under Section 1226(c). Second, Idowu has relief that directly applies to her—her SIJ status and Section 1227(c)'s deportability waiver—where *Parra* had none. Third, there were considerable concerns in *Parra* about his danger to the community given his conviction as well as his flight risk. Idowu has not had the opportunity to address those concerns, nor has the Government made any findings on them. Moreover, the Court reads *Parra* in light of the Supreme Court's decision in *Zadvydas*, decided two years after *Parra*. *Zadvydas* held that noncitizens like Idowu, who are subject to final orders of removal, retain a liberty interest under the Due Process Clause. 533 U.S. at 690. In light of these differences and the Supreme Court's decision in *Zadvydas*, Respondent's assertion—that *Parra* eliminates any liberty interest Idowu has—is without merit.

On balance, the *Mathews* factors weigh in Idowu's favor. She received no procedure before or during her detention, and the Government's interest in removing her, given her SIJS and Section 1227(c)'s waiver, is minimal. The Court concludes that her detention violates procedural due process.

### C. Deferred Action and Wrongful Arrest

Idowu also challenges USCIS's termination of her SIJS-based deferred action on September 14, 2026 and her arrest on September 21, 2026. The Court declines to address these questions now. First, they are unnecessary to resolve Idowu's detention status. Second, the parties' briefing is insufficient for this Court to consider those claims fully, and additional briefing will be required. Third, now that this Court has

decided the detention issue, these claims may be moot. The Court will address these issues with the parties at a later time.

## CONCLUSION

The grant of habeas relief in this case does not reach the Government's decision to execute the removal order. It does, however, provide for release from detention because removal was not reasonably foreseeable and the Government afforded no due process in its decision to detain Idowu. The Government is certainly free to seek revocation of Idowu's SIJS status through the appropriate process. Similarly, Idowu may also seek termination of the order of removal from an immigration judge, or a stay of execution of the order of removal given her SIJS status. What the Government cannot do is unilaterally detain Idowu while she holds SIJS status, with a congressionally mandated waiver under Section 1227(c). Idowu's detention violates both her substantive and procedural due process rights under the Fifth Amendment.[10]

For the reasons stated above, the Court grants Idowu's habeas petition only as to Idowu's substantive and procedural due process claim regarding her detention. The Court hereby orders that:

1. Respondents immediately release Idowu from custody, without any restrictions on her liberty, within 24 hours of the issuance of this Order;
2. Prior to Idowu's release, Respondents must first notify Idowu's counsel, within two hours of her impending release, and include the location of her release and approximate release time, so that Idowu's counsel can arrange transportation;
3. No later than October 29, 2026 by 5:00 p.m., Respondents shall certify compliance with this Court's order; and
4. Respondents shall not re-detain Idowu without prior notice and authorization from this Court based on the same grounds asserted before this Court, and absent a new and independently lawful custody decision properly executed under the law.

**SO ORDERED.**

Dated: October 27, 2026

Sunil R. Harjani
United States District Judge

[10] In order to resolve this matter without further litigation, the Court asks the United States Attorney to communicate with the Department of Homeland Security. The Court suggests the Government reconsider its decision and join in the motion to reopen Idowu's case before the immigration court. In that way, Idowu can receive a hearing and a decision on the prior order of removal, which could moot any remaining issues in this case.